## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BERKSHIRE HATHAWAY HOMESTATE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 17 C 9370 |
| CHICAGO METROPOLITAN HOSPITAL, LLC, ROBERT D. DIELEMAN, and KATHLEEN C. DIELEMAN, | ) ) ) ) | Judge Joan H. Lefkow |
| Defendants. | ) ) | |

## <u>OPINION AND ORDER</u>

In this insurance coverage dispute over fire damage at a vacant hospital building,

Berkshire Hathaway Homestate Insurance Company and Chicago Metropolitan Hospital, LLC

have filed cross-motions for summary judgment. For the reasons explained below, Chicago

Metropolitan's motion (dkt. 129) is denied. Berkshire's motion (dkt. 123) is granted as to

Chicago Metropolitan's counterclaim under Section 155 of the Illinois Insurance Code (Count III

of the second amended counterclaim) and denied in all other respects. Berkshire's motion against

Robert D. and Kathleen C. Dieleman (dkt. 126) is denied. The matter is set for status on

February 23, 2021 at 11:00 a.m. The parties should be prepared to discuss whether this matter

can be settled without further litigation.[1]

---

[1] The court has jurisdiction under 28 U.S.C. § 1332. Berkshire is a citizen of Nebraska (dkt. 141 ¶ 1), and the Dielemans are citizens of Nevada. (*Id.* ¶¶ 6–7.) The court concluded in an earlier order that Chicago Metropolitan is a citizen of Illinois and Canada because Chicago Metropolitan admitted in its answer that its two members are citizens of Illinois and Canada. (Dkt. 97 at 2 n.1.) Chicago Metropolitan now contends that it has only one member, a citizen of Illinois. (Dkt. 137 ¶ 3.) But in support, it cites its answer admitting that it has a single manager, which is different from a member. (Dkt. 66 ¶¶ 10–11.) The evidentiary record confirms the court's conclusion in its last order. Berkshire has two members: Dr.

## BACKGROUND[2]

### I. The Property

In 2013, Chicago Metropolitan purchased a vacant, multi-story building (the "Property")
in Chicago that once operated as Sacred Heart Hospital, hoping to use it as a freestanding
emergency center. (Dkt. 137 ¶ 7; dkt. 141 ¶¶ 3, 31–32.) Chicago Metropolitan obtained a
$500,000 loan from the Dielemans, secured by a mortgage on six parcels of land, including the
Property. (Dkt. 145 ¶¶ 41–43.)

When Chicago Metropolitan purchased the Property, it was already equipped with a fire
alarm system, which Chicago Metropolitan kept as-is. (Dkt. 137 ¶¶ 7–10.) The alarm system had
two main components: a building alarm system, and a city tie box that reported any alarm to
Chicago authorities. (Dkt. 141 ¶ 38.) Chicago Metropolitan owned and was responsible for the
building alarm system. (*Id.* ¶¶ 53–54.) The City of Chicago's Office of Emergency Management

---

Suhail, a citizen of Illinois, and Dr. Paulillia, a citizen of Canada. (Dkt. 125-1 at 7:20–21, 9:22–10:4.) The
parties' citizenship is therefore completely diverse. The amount in controversy also exceeds $75,000.
Venue is proper in this district under 28 U.S.C. § 1391(b).

[2] Unless otherwise noted, the facts set out below are taken from the parties' Local Rule 56.1
statements and are construed in the light most favorable to the non-moving party. The court will address
many but not all the factual allegations in the parties' submissions, as the court is "not bound to discuss in
detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v.
*UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Following its regular practice, the court has
considered the parties' objections to the statements of facts and includes in its opinion only those portions
of the statements and responses that are appropriately supported and relevant to the resolution of this
motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

The court overrules both Chicago Metropolitan and the Dielemans' objections to Berkshire's
statements of fact. Chicago Metropolitan objects to Berkshire's reliance on expert John Consiglio to reach
an ultimate legal conclusion about the meaning of a term in the Policy. The court does not read Consiglio
to make such a conclusion. In any event, the court interprets the term without reference to Consiglio's
report or deposition. The Dielemans object to Berkshire's reliance on its own counsel to support some
statements of fact. As discussed below, because those facts are not relevant, the court ignores rather than
strikes them.

and Communications ("OEMC") owned the tie box. (*Id.* ¶ 52). The parties dispute whether Chicago Metropolitan had any control over it. (Dkt. 137 ¶¶ 11–12.)

As relevant here, Chicago Metropolitan's building alarm system consisted of a network of "initiating and notification devices" (smoke and heat detectors (dkt. 125-6 at 84:19–85:6)) throughout the Property and a fire alarm control panel. (Dkt. 141 ¶ 39.) When in full working condition, the initiating and notification devices would detect the presence of smoke or heat and send a signal to the control panel, which would then send a signal to the city tie box. (Dkt. 141 ¶¶ 42–46.) Once the city tie box received a signal from the control panel, it would send its own signal to OEMC over a dedicated and reliable circuit. (*Id.* ¶¶ 47–51.) Alternatively, someone in the Property could manually transmit a signal from the tie box to OEMC by pulling a lever. (*Id.* ¶ 47.) The tie box was powered by a winding spring that would function only if properly wound. (Dkt. 137 ¶ 12.) When the tie box sent a signal, the spring unwound and, if the spring unwound completely, the tie box would no longer be able to send a signal. (*Id.*)

Chicago Metropolitan retained Don Wiszowaty, the long-time director of plant operations at Sacred Heart, to check in on the Property weekly and "make sure 'everything is up and running.'" (Dkt. 141 ¶¶ 71, 73; dkt. 137 ¶ 9.) Part of Wiszowaty's duties included inspecting the fire alarm system. (Dkt. 141 ¶ 73.) Wiszowaty, however, had no training in engineering or fire protection systems; he did not know how to fix the fire alarm system. (*Id.* ¶¶ 76–77, 80.) Rather, Wiszowaty would visually inspect whether electricity was flowing to the alarm system by checking whether all the lights on its components were lit. (*Id.* ¶ 81.) Chicago Metropolitan did not engage anyone else to inspect or test the Property's fire alarm system. (*Id.* ¶¶ 74, 78–79.) Wiszowaty's periodic visual inspections did not meet the testing requirements of either the City

3

of Chicago Municipal Code or Chapter 72 of the National Fire Protection Association, both of which required periodic testing of fire alarm systems and more rigorous inspections. (*Id.* ¶ 55.)

## II.      The Policy

Berkshire issued a commercial lines insurance policy to Chicago Metropolitan from September 2016 to September 2017 that covered damage to the Property, including damage caused by fire. (Dkt. 141 ¶¶ 23–25.) The Policy also included a protective-safeguards endorsement, which provided that "[a]s a condition of this insurance, [Chicago Metropolitan] is required to maintain the protective devices or services listed in the [s]chedule above," which included an "[a]utomatic [f]ire [a]larm, protecting the entire building, that is . . . [c]onnected to a central station; or . . . [r]eporting to a public or private fire alarm station." (*Id.* ¶ 30.) The endorsement further added the following exclusions to coverage:

> [Berkshire] will not pay for loss or damage caused by or resulting from fire if, prior to the fire, [Chicago Metropolitan]:
>
> > (1) Knew of any suspension or impairment in any protective safeguard listed in the [s]chedule above and failed to notify [Berkshire] of that fact; or
> >
> > (2) Failed to maintain any protective safeguard listed in the [s]chedule, and over which [it] had control, in complete working order."

(*Id.*) The Policy also excluded coverage for theft and vandalism. (*Id.* ¶¶ 28–29.)

The Dielemans were listed as Loss Payees under the Policy. (Dkt. 145 ¶ 31.) In a separate endorsement, the Policy provided:

> b. For Covered Property in which both [Chicago Metropolitan] and a Loss Payee have an insurable interest:
>
> > * * *
>
> > (3) If [Berkshire] den[ies] [Chicago Metropolitan's] claim because of [its] acts or because [it has] failed to comply with the terms of the

Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

> (a) Pays any premium due under this Coverage Part at our request if [Chicago Metropolitan has] failed to do so;

> (b) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of [Chicago Metropolitan's] failure to do so; and

> (c) Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

(4) If we pay the Loss Payee for any loss or damage and deny payment to [Chicago Metropolitan] because of [its] acts or because you have failed to comply with the terms of this Coverage Part:

> (a) The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

> (b) The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, [Chicago Metropolitan] will pay [its] remaining debt to us.

(*Id.* ¶ 33.)

## III. The Fire and Aftermath

On June 25, 2017, a fire occurred on the Property. (Dkt. 141 ¶ 56.) The city tie box did not send a signal to OEMC as it should have; instead, someone nearby noticed smoke and called 911 to report the fire. (*Id.* ¶¶ 57–58, 60.) Firefighters arrived on the scene and suppressed the fire. (Dkt. 125-8.) Because the fire suppression effort flooded most of the alarm system, no one confirmed through on-site testing why the alarm system did not work. (Dkt. 125-6 at 119:19–22; dkt. 138-17 at 62:4–9.) Berkshire proposes that Chicago Metropolitan's building alarm system

5

failed, meaning coverage was excluded because Chicago Metropolitan failed to keep a protective safeguard "over which [it] had control, in complete working order." Chicago Metropolitan, on the other hand, proposes that the City of Chicago failed to maintain its city tie box, potentially making the exclusion inapplicable.

There is enough evidence to support either party's theory. First, Chicago Fire Department Battalion Chief Michael Timothy, one of the first firefighters on the scene, testified that he did not hear alarms bells sounding in the Property. (Dkt. 141 ¶ 61; dkt. 125-8 at 2 ("[T]here were no alarms heard . . . during this event.").) Ordinarily, he said, those alarm bells would be deafeningly loud. (Dkt. 125-9 at 23:11–18.) That would suggest that Chicago Metropolitan's building alarm system was not in complete working order. On the other hand, defense expert John Consiglio could not conclude that the bells were ringing merely because the firefighters did not hear them, depending on the distance between the bells and the firefighters and the firefighters' gear. (Dkt. 125-6 at 89–90.)

Second, several false alarms in the months and years before the fire show that the city tie box was capable of sending a signal to OEMC. (Dkt. 141 ¶ 86.) Most importantly, on June 1, 2017—about three weeks before the fire in this case—the city tie box sent a signal to OEMC in what turned out to be a false alarm. (Dkt. 137 ¶ 19.) Because the city tie box was functional as recently as three weeks before the fire, that could support the conclusion that the city tie box was functional at the time of the fire.

Third, there is some evidence suggesting that the spring in the city tie box was never rewound after the June 1 false alarm. About a week after the fire, City of Chicago firefighters returned to the Property to test the city tie box. Tom Costantini, an employee of an independent contractor that Berkshire engaged to assess the loss, happened to be on site during the

6

firefighters' test. (Dkt. 137 ¶ 35.) Costantini watched the firefighters rewind the spring on the city tie box and pull a lever to send a test signal to OEMC, which OEMC received. (*Id.*) But there is crucial, conflicting evidence about the order in which he saw these two events. If he saw the firefighters first wind the spring and then pull the lever, as Costantini described it in an August 2017 email to a Berkshire claims adjuster, that could mean that the spring was unwound at the time of the fire, suggesting that the alarm system failed because City of Chicago firefighters failed to rewind the spring after the false alarm on June 1. (Dkt. 131-13.) If he saw the firefighters first pull the lever and then wind the spring, as Costantini described it at his February 2020 deposition and in conversations with Consiglio, that would mean the city tie box was properly wound at the time of the fire, suggesting that there was some problem with Chicago Metropolitan's building alarm system. (Dkt. 138-17 at 35–37; dkt. 125-6 at 111–12.)

Although Consiglio concluded that the city tie box was operational at the time of the fire and Chicago Metropolitan has no expert of its own to contradict him, a jury taking the evidence in the light most favorable to Chicago Metropolitan could reject Consiglio's conclusion. Consiglio relied on two facts to reach his conclusion, both of which a reasonable jury could reject. First, he relied on Costantini's second telling of events (that the firefighters first pulled the lever and then rewound the spring), but a jury could instead credit Costantini's original story (the reverse sequence). (Dkt. 131-13 ("I physically watched the CFD personnel[] use a crank[] to wind the box. Captain Nolan *then* called the dispatch and indicated that the box would be pulled." (emphasis added).) Second, Consiglio reasoned that OEMC would have a record of a city tie box's being fully unwound, and the absence of such a record suggests that the tie box never malfunctioned. (Dkt. 125-6 at 180:11–23.) But because Consiglio admitted that he is not personally familiar with OEMC's recordkeeping practices (*id.* at 244:14–18, 245:7–15), a jury

could conclude that the tie box was not functioning even though there is no OEMC record of its failing.

Thus, although there is no dispute that the alarm system was not in complete working order, there is a genuine dispute about whether the city tie box or the building alarm system (or both) was not "in complete working order" at the time of the fire.

## IV.  The Dispute

In all, the fire caused more than $1,000,000 in damage. (Dkt. 152 ¶ 10.) Two days after the fire, Chicago Metropolitan notified Berkshire of the fire and made a claim for loss under the Policy. (Dkt. 141 ¶ 62.) Berkshire retained several contractors and experts to investigate and adjust the claim. (*Id.* ¶¶ 66–68.) The investigation lasted several months, during which time Berkshire sent several reservation-of-rights letters keeping Chicago Metropolitan abreast of the investigation. (*Id.* ¶ 69.)

On November 17, 2017, the Dielemans sent a letter to Berkshire claiming a first-priority lien on any proceeds of Chicago Metropolitan's claim but did not make a claim themselves, mistakenly believing that they were not listed as loss payees under the Policy. (Dkt. 145 ¶ 39.) Berkshire never responded to that letter. (Dkt. 152 ¶ 2.)

On December 29, 2017, Berkshire denied coverage to Chicago Metropolitan for five reasons: (1) Chicago Metropolitan violated the protective-safeguards endorsement; (2) The Policy did not cover theft or vandalism; (3) Chicago Metropolitan failed to protect the Property from further damage; (4) The Policy did not cover water damage; and (5) Chicago Metropolitan failed to have all public utilities activated and operating. (Dkt. 141 ¶ 83; dkt. 125-12.) Berkshire did not copy the Dielemans or their attorney on the denial letter. (Dkt. 125-12 at 1.) The same

day, Berkshire filed this suit seeking a declaration of its rights and obligations against Chicago

Metropolitan and the Dielemans. (Dkt. 1.)

Berkshire presents the chronology of its efforts to resolve the Dielemans' claim during

litigation (dkt. 128 ¶¶ 44–62), but the Dielemans ask the court to ignore those efforts (dkts. 156,

157), and the court obliges. What matters for this motion is that a few years into the case,

Berkshire paid the Dielemans the full amount to which they were entitled under the Policy. (Dkt.

97 at 1–2.) Because the Dielemans were paid, the court awarded summary judgment to Berkshire

on its declaratory judgment claim against the Dielemans and the Dielemans' counterclaim for

breach of contract. (*Id*.) The court did not address whether Berkshire had acted vexatiously and

unreasonably by either ignoring or rejecting the Dielemans' claim in the first instance. (*Id.* at 10.)

In its amended complaint, Berkshire seeks a declaration of no coverage against Chicago

Metropolitan (Counts I and II) and a declaration of its rights against the Dielemans (Count III).

(Dkt. 65.) In its second amended counterclaim, Chicago Metropolitan asserts breach of contract

(Count I), declaratory judgment (Count II), and vexatious and unreasonable claim handling

(Count III). (Dkt. 54.) The Dielemans similarly assert vexatious and unreasonable claim handling

(Count II) in their amended counterclaim. (Dkt. 55.)

Chicago Metropolitan and Berkshire now file cross-motions for summary judgment (dkts.

123, 129), and Berkshire seeks summary judgment on the Dielemans' remaining claim. (Dkt.

126.)

## **LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine issue of material fact exists, the court must look beyond the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007). When considering cross-motions for summary judgment, the court must be careful to draw reasonable inferences in the correct direction. See, e.g., *Int'l Bhd. of Elec. Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare*, 629 F.3d at 704.

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, the non-moving party cannot rest on their pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S. Ct. 2548; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.*, 477 U.S. at 323–24, 106 S. Ct. 2548.

## ANALYSIS

### I. Berkshire vs. Chicago Metropolitan

#### A. The Condition

The Policy contains a protective-safeguards endorsement with two distinct provisions, a condition and an exclusion. The former provides, "As a condition of this insurance, [Chicago Metropolitan is] required to maintain the protective devices or services listed in the Schedule

10

above." (Dkt. 141 ¶ 30.) The Schedule requires an "automatic fire alarm, protecting the entire building, that is: (a) connected to a central station; or (b) reporting to a public or private alarm station." (*Id.*) Under Illinois law, "a clear endorsement requiring a protective device or system is a condition precedent to coverage for certain losses and . . . if the insured fails to comply with the endorsement's requirements, there is no coverage under the policy." *Nat'l Fire & Marine Ins. Co.* v. *3327 W. 47th Place, LLC*, No. 16 C 11590, 2017 WL 5499154, at *4 (N.D. Ill. Nov. 16, 2017). Compliance with a condition precedent is a question of whether "the claim falls within the coverage of an insurance policy," on which Chicago Metropolitan bears the burden of proof. *Addison Ins. Co.* v. *Fay*, 905 N.E.2d 747, 752, 232 Ill. 2d 446 (2009).

The fundamental facts of how Chicago Metropolitan kept and monitored its fire alarm system are undisputed. Chicago Metropolitan used the system that Sacred Heart had already installed, which was an "automatic fire alarm, protecting the entire building" and "connected to a central station." Chicago Metropolitan hired Wiszowaty to check the system once a week for anything visibly amiss, though he could not have fixed the system if he needed to. This level of inspection was not up to municipal code or National Fire Protection Association standards, both of which required periodic testing, among other things. The dispute is therefore whether the existence of a qualifying fire alarm plus this inspection routine satisfied Chicago Metropolitan's obligation to "maintain" a fire alarm system under the Policy. This dispute is legal and appropriate for the court to resolve on summary judgment. *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212, 154 Ill. 2d 90 (1992) ("The construction of an insurance policy's provisions is a question of law.").

At the outset, each party contends that binding precedent already answers this question in its favor, but the court is not persuaded. Chicago Metropolitan contends that the word "maintain"

11

is ambiguous as a matter of Illinois law, citing a century-old Illinois Supreme Court case, *Schneider* v. *Neubert*, 139 N.E. 84, 84, 308 Ill. 40 (1923). In *Schneider*, property owners hired a contractor to build a garage and required him to "maintain" liability insurance. *Id.* at 84. The parties disputed who was supposed to pay the premium. *Id.* The court stated that reference to the word "maintain" alone could not resolve that dispute. *Id.* at 85. "Maintain" was ambiguous in the contract both because it "has many different meanings" and because the "association of the clause in dispute with other clauses in the contract renders the true intent of the parties uncertain." *Id.* at 84–85. *Schneider* does not mean that "maintain" is ambiguous in every contract under Illinois law, only that its meaning was ambiguous in that contract.

For its part, Berkshire cites several cases holding that failing to have a protective safeguard at all violates the requirement to "maintain" one, which does not apply here because Chicago Metropolitan had a fire alarm. *3327 W. 47th Place*, 2017 WL 5499154, at *4 (no coverage because insured "did not have an Automatic Burglary Alarm protecting the entire Building"); *Indian Harbor Ins. Co.* v. *Randolph Partners, LLC – 740 Series*, No. 08 C 629, 2010 WL 3155974, at *5 (N.D. Ill. Aug. 10, 2010) (no coverage because "there was not a central station fire alarm for any part of the building during the period in which the insurance policy was in effect"); *Burmac Metal Finishing Co.* v. *W. Bend Mut. Ins. Co.*, 825 N.E.2d 1246, 1258–59, 356 Ill. App. 3d 471 (2005) (affirming jury verdict that insured's capping of sprinkler heads did not substantially comply with condition). Berkshire also cites cases holding that coverage was excluded because a protective safeguard was not "maintained in complete working order," which is a distinct issue from whether the insured merely "maintained" a protective safeguard. *E.g.*, *Goldstein* v. *Fid. & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 754 (7th Cir. 1996) (no coverage where sprinkler system did not work at time of fire); *Scottsdale Ins. Co.* v. *Logansport Gaming,*

12

*L.L.C.*, 556 F. App'x 356, 359 (5th Cir. 2014) (per curiam) (under Louisiana law, coverage excluded where insured "conced[ed] that the fire suppression system did not work on the day of the fire"). Finally, Berkshire cites nonbinding authorities more closely on point, which the court considers for their persuasive authority. *Great Lakes Reinsurance (UK), PLC* v. *JDCA, LLC*, No. 11 C 00001, 2014 WL 6633039, at *9–10 (D. Conn. 2014) (holding that identically worded condition required "the existence of a functioning sprinkler system" where insured disputed only which property the condition applied to and not the meaning of "maintain").

Because none of these authorities compels the court to adopt either party's definition of "maintain," the must construe the word as it appears in this Policy.

> In construing an insurance policy, the court must ascertain the intent of the parties to the contract. To ascertain the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole, with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract. If the words in the policy are unambiguous, a court must afford them their *plain, ordinary, and popular meaning*. However, if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy.

*Outboard Marine Corp.*, 607 N.E.2d at 1212 (citations omitted). "'Usual and ordinary meaning' has been stated variously to be that meaning which the particular language conveys to the popular mind, to most people, to the average, ordinary, normal [person], to a reasonable [person], to persons with usual and ordinary understanding, to a business [person], or to a lay [person]." *Id.* at 1216 (quoting 2 Couch on Ins. 2d § 15:18 (rev. ed. 1984)).

Berkshire proposes that the usual and ordinary meaning of "maintain" is to ensure functionality. But that interpretation does not fit within the Policy as a whole. The protective-safeguards endorsement uses the word "maintain" twice, giving crucial context. First, the condition precedent merely requires Chicago Metropolitan to "maintain" an alarm system. Second, the exclusion requires Chicago Metropolitan to "maintain any protective safeguard listed

in the [s]chedule, *and over which [it] had control, in complete working order*." (Dkt. 141 ¶ 30 (emphasis added)). "A court must strive to give each term in the policy meaning unless to do so would render the clause or policy incoherent or inherently contradictory." *Outboard Marine Corp.*, 607 N.E.2d at 1219. If "maintain" means "ensure functionality," then the exclusion's phrase "maintain . . . in complete working order" would be superfluous. *Cf. Breton, LLC* v. *Graphic Arts Mut. Ins. Co.*, 446 Fed. App'x 598 (4th Cir. 2011) ("[I]nterpreting 'maintain' to require ensuring operability would render the 'in complete working order' language in the exclusion superfluous."). "Maintain" thus requires less than ensuring that the system is functional.

Chicago Metropolitan proposes that the usual and ordinary meaning of "maintain" is to "continue" or "continue in possession of," and that Chicago Metropolitan maintained a fire alarm simply by keeping Sacred Heart's system in the Property. This interpretation does not fit within the whole Policy, either. The word "maintain" must be read in light of the "risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp.*, 607 N.E.2d at 1212. The purpose of the protective-safeguards endorsement is to alter the risk undertaken—fire alarms make fires less damaging. By extension, requiring the insured to "maintain" a fire alarm must entail some baseline expectation of functionality that would make the fire alarm helpful in preventing or controlling fires. The endorsement thus evinces the parties' intent that Chicago Metropolitan not only physically possess an alarm system but also that the alarm system decreases the risk of fire damage.

Neither party's proposed definition works with the Policy as a whole. "Maintain" must therefore fall somewhere on the continuum between "possess" and "ensure functionality." Where exactly on that continuum it falls is murky. But Illinois law cuts through the murk in favor of the

insured—if there is "more than one reasonable interpretation," the court must construe the language "in favor of the insured and against the insurer who drafted the policy." *Outboard Marine Corp.*, 607 N.E. 2d at 1212.

The closest definition of "maintain" that fits these criteria is one that Chicago Metropolitan cites in its brief from Black's Law Dictionary: "To care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." Black's Law Dictionary 1039 (9th ed. 2009); (dkt. 130 at 9). And because there is no factual dispute, the court concludes that Chicago Metropolitan satisfied its obligation to "maintain" a fire alarm system. Chicago Metropolitan not only possessed an alarm system but cared for it for purposes of operational productivity. Chicago Metropolitan retained Wiszowaty, who entered the Property every week to inspect the Property and its equipment, including the fire alarm system. Wiszowaty's weekly visual observations of the lights on the alarm system's control panel were a form of care in the name of operational productivity, general repair, and upkeep. Though Wiszowaty received no special training in this type of alarm system and could not have repaired it if he needed to, his inspections led him to believe that it did not need repairs. Chicago Metropolitan therefore possessed a fire alarm system that it cared for and on which it engaged in general repair and upkeep.

Berkshire argues that this inspection routine did not satisfy either the Chicago Municipal Code or the National Fire Protection Association standards. But nothing in the text or structure of the Policy incorporates either of these standards. Berkshire could have incorporated an external standard into the Policy, (*see, e.g.*, dkt. 125-4 at 49 (excluding "certified act of terrorism" based on certification by Secretary of Treasury under the Terrorism Risk Insurance Act)), but in this provision did not. This does not mean that property owners may disregard safety regulations with

impunity. The City of Chicago, for instance, could bring an enforcement action or levy a penalty. And it is likely that protective safeguards that are not frequently and thoroughly inspected will not be in "complete working order," thus excluding coverage. But the question in this case is not whether Chicago Metropolitan complied with regulations but whether Berkshire incorporated these regulations into the word "maintain," which it did not.

### B.    The Exclusion

"Once the insured has demonstrated coverage, the burden then shifts to the insurer to prove that a limitation or exclusion applies." *Fay*, 905 N.E.2d at 752. A covered loss is excluded under the protective-safeguards endorsement if Chicago Metropolitan "[f]ailed to maintain any protective safeguard listed in the Schedule, and over which [it] had control, in complete working order." (Dkt. 141 ¶ 30.) Whereas there is some wiggle room in the meaning of "maintain," "maintain in complete working order" is unambiguous. Coverage is excluded if a portion of the fire alarm under Chicago Metropolitan's control fails to function as intended.

Chicago Metropolitan argues that the exclusion is unenforceable, but the court agrees with Berkshire that Chicago Metropolitan has forfeited that argument by insufficiently developing it. *Tyler* v. *Runyon*, 70 F.3d 458, 464 (7th Cir. 1995) ("[A] litigant who fails to press a point by supporting it with pertinent authority . . . forfeits the point.") (citations omitted). Chicago Metropolitan contends that the exclusion conflicts with Illinois's Standard Fire Policy, a statewide standard promulgated by the Director of Insurance. *See Streit* v. *Metropolitan Cas. Ins. Co.*, 863 F.3d 770, 773 (7th Cir. 2017) ("[I]n the event of a conflict between an insurer's policy and the Standard Fire Policy, the latter controls.") Chicago Metropolitan quotes a court opinion explaining that the Standard Fire Policy insures "against all direct loss by fire . . . except as hereinafter provided." (Dkt. 130 at 14 (quoting *Streit*, 863 F.3d at 773).) But Chicago

16

Metropolitan neither explains what is "hereinafter provided" nor provides the court with a citation to research the matter for itself. Chicago Metropolitan waited until its reply brief to assert without citation that maintenance of a protective safeguard is not one of the exceptions (dkt. 155 at 14 n.5), which is both too little and too late. The court will not fill in the blanks.

Although the exclusion is unambiguous and enforceable, there is a factual dispute about whether it applies. There is no genuine dispute that the fire alarm system did not send a signal to OEMC at the time of the fire and therefore was not in "complete working order." But there is sufficient evidence in the record to support two possible reasons why the alarm system did not send a signal to OEMC: 1) The building alarm system did not send a signal to the city tie box; or 2) The city tie box was incapable of sending a signal to OEMC at the time of the fire.[3] Coverage is excluded if the former is true; coverage might not be excluded if the latter is true.

The jury could credit Costantini's emails, in which he claims to have observed the firefighters first rewind the spring and then pull the lever. If so, the jury could infer that the spring was fully unwound at the time of the fire, meaning the city tie box failed. It could also conclude that the city tie box was under the City of Chicago's control, rather than Chicago Metropolitan's, making the exclusion inapplicable. If, on the other hand, a jury credits Consiglio's conclusion based on Costantini's deposition, it could find that the city tie box functioned at the time of the fire. If so, the building alarm system must have failed, making the exclusion apply. A reasonable jury could also credit Timothy's testimony that he would have heard alarm bells if the building alarm system were functioning, or his statement that Chicago Metropolitan had some responsibility for the city tie box. Or it could conclude based on Chicago

---

[3] These are not mutually exclusive. Even if Chicago Metropolitan proves that the city tie box failed, a reasonable jury could conclude that the building alarm system also failed and render a verdict for Berkshire.

Metropolitan's legally sufficient but lax maintenance routine that it is simply more likely than not that the building alarm system failed. Because a jury could find in either party's favor, neither party is entitled to summary judgment.

### C. Vexatious and Unreasonable Conduct

Section 155 of the Illinois Insurance Code permits an insured to obtain attorneys' fees and monetary penalties if an insurer's conduct in disputing a claim was "vexatious and unreasonable." 215 Ill. Comp. Stat. 5/155(1). "An insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Scottsdale Indem. Co.* v. *Village of Crestwood*, 784 F. Supp. 2d 988, 998 (N.D. Ill. 2011) (quoting *Citizens First Nat. Bank of Princeton* v. *Cincinnati Ins. Co.*, 200 F.3d 1102 (7th Cir. 2000)). "Whether an insurer's conduct was vexatious and unreasonable is a question for the [c]ourt's determination, not a jury." *Id.*

There is no genuine dispute that Berkshire meets several of these criteria. As both parties recognized, the definition of "maintain" in a protective-safeguards endorsement is not settled under Illinois law, and Berkshire's proposed interpretation was reasonable. *TKK USA, Inc.* v. *Safety Nat'l Cas. Corp.*, 727 F.3d 782, 794 (7th Cir. 2013) (affirming denial of Section 155 request on summary judgment where "neither party nor the district court could cite an Illinois case directly on point"). Moreover, Berkshire relied on a "genuine legal or factual issue." During its prompt and thorough investigation, Berkshire learned that the fire alarm system was not in "complete working order" at the time of the loss, triggering an exclusion under the Policy if the system was under Chicago Metropolitan's control. Although the court concludes that there

18

remains a narrow factual dispute, Berkshire nonetheless gathered enough evidence to create a "genuine . . . factual issue" about the applicability of the protective-safeguards exclusion.

Finally, Chicago Metropolitan argues that Berkshire knew about Chicago Metropolitan's maintenance routine when it issued the Policy and therefore could not have denied coverage in good faith for failure to maintain a fire alarm. But this ignores the exclusion, which required Chicago Metropolitan not only to "maintain" a fire alarm but also to maintain it in "complete working order." Because Chicago Metropolitan admits that the fire alarm did not send a signal to OEMC during the fire, the system indisputably was not in "complete working order" at the time of the fire because it failed in its essential function. All that remains is a narrow factual dispute about which part of the system failed, for which Berkshire has ample evidence to support its conclusion (though not enough to avoid trial).

## II.    Berkshire vs. the Dielemans

The Dielemans' Section 155 claim posits that although Berkshire ultimately paid them as required under the Policy, Berkshire's initial denial was vexatious and unreasonable. The Dielemans contend that Berkshire either ignored or forgot about the Dielemans' claim, thus denying it without developing any bona fide defense.

Berkshire proposes two reasons why it is entitled to summary judgment against this claim. First, Berkshire argues that it indeed had a bona fide defense to the Dielemans' claims: that losses stemmed from theft and vandalism, which were excluded under the Policy. The Policy excludes those causes of loss, and the Dielemans are subject to those exclusions. (Dkt. 121 ¶¶ 28–29); *see Old Second Nat'l Bank* v. *Ind. Ins. Co.*, 29 N.E.3d 1168, 1175 (Ill. App. Ct. 2015) ("[T]he terms and conditions of the insurance policy are deemed to apply equally to the loss payee . . . ."). But this argument fails for two reasons. First, Berkshire has not asserted vandalism

19

or theft damage in its Rule 56.1 statements and thus cannot prove either on this motion. Second, even if vandalism and theft losses occurred, the fire caused most of the loss. No one disputes that the fire was covered as to the Dielemans because they did not personally breach any obligation to maintain a fire alarm. (Dkt. 145 ¶ 33.) Berkshire thus cannot argue that its investigation into the extent of vandalism and theft justified its decision to deny the Dielemans' claim for fire damage.

Second, Berkshire argues that it delayed payment to investigate bona fide coverage disputes about the extent of the Dielemans' financial interest. Berkshire did not start looking into the Dielemans' financial interest until after it denied coverage and filed this suit. The court agrees with the Dielemans that under *Cooke* v. *Jackson National Life Insurance Company*, 919 F.3d 1024 (7th Cir. 2019), this court should not consider anything that transpired after Berkshire filed this suit in its Section 155 analysis. Once federal litigation begins, an insurer's litigation conduct is subject to federal rules of practice rather than the state standard of vexatious and unreasonable conduct. *Id.* at 1027. The appropriate question under state law is why Berkshire denied coverage to the Dielemans in the first place, not whether it litigated too slowly.[4]

The Dielemans sent their notice of lien to Berkshire on November 17, 2017, which Berkshire denied on December 29, 2017 by filing this suit. In the intervening six weeks, Berkshire never responded to the Dielemans' notice of lien and instead continued to investigate only Chicago Metropolitan's claim. Under the Policy, however, the Dielemans' rights and Chicago Metropolitan's rights were not coextensive. The Dielemans were entitled to recover for fire damage if Berkshire denied coverage based on Chicago Metropolitan's actions or inactions, which is exactly what happened. (Dkt. 145 ¶ 33.) Berkshire denied coverage for five reasons—

---

[4] The Dielemans' position is a double-edged sword: if the court cannot consider any of Berkshire's post-litigation conduct, it cannot consider any of Berkshire's post-litigation delay, either. (Dkt. 154 at 1–2.)

three (protective safeguards, failure to protect from damage, and failure to maintain utilities) were grounded in Chicago Metropolitan's failures, and two (theft/vandalism and water damage exclusions) did not apply to fire damage at all. Thus, at the time Berkshire denied coverage to the Dielemans, it had articulated no reason not to pay the Dielemans under the Policy.

Berkshire has offered no valid reason why it denied the Dielemans' claim that would render its conduct "not unreasonable and vexatious" under section 155. The Dielemans have not moved for summary judgment, however. Thus, the court simply denies Berkshire's motion for summary judgment.

## ORDER

Berkshire Hathaway Homestate Insurance Company's motion for summary judgment against Chicago Metropolitan Hospital, LLC (dkt. 123) is granted as to Count III of Chicago Metropolitan's amended counterclaim and denied in all other respects. Chicago Metropolitan's motion for summary judgment (dkt. 129) is denied. Berkshire's motion for summary judgment against Robert and Kathleen Dieleman (dkt. 126) is denied. The matter is set for status on February 23, 2021 at 11:00 a.m. The parties should be prepared to discuss whether this matter can be settled without further litigation.

Date: January 29, 2021

_____
U.S. District Judge Joan H. Lefkow